IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 22-00122-01-CR-W-SRB |
| | ) |
| MARIO T. STEWART, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION TO
DENY DEFENDANT'S MOTION TO SUPPRESS**

Before the Court is Defendant's Motion to Suppress. Defendant moves the Court to suppress the firearm and all statements made to law enforcement in connection with his August 10, 2021, arrest. For the following reasons, Defendant's motion should be denied.

**I. INTRODUCTION**

On May 31, 2022, an Indictment was returned charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On April 20, 2023, Defendant filed the instant motion to suppress. (Doc. 31) The Government responded on June 15, 2023. (Doc. 40) Following the parties' requests for extensions, an evidentiary hearing was held on July 18, 2023, with all parties and counsel appearing in person. The Government appeared by Assistant United States Attorney Robert Smith. Defendant was present, represented by appointed counsel Bill Raymond. The Government called FBI Task Force Officer James Rader to testify. The following exhibits were admitted into evidence:

    Government's Exhibit 1:    Photograph of gun case and holster [STEW_00003127];
    Government's Exhibit 2:    Photograph of loaded magazine in gun case
                                       [STEW_00003129];

1

| | |
|---|---|
| Government's Exhibit 3: | Recorded phone call from Defendant to Detective Rader [STEW_00003125]; |
| Government's Exhibit 3(a): | Excerpt from 04:27-05:04 from recorded call from Defendant to Detective Rader [STEW_00003125]; |
| Government's Exhibit 4: | Photograph of rear of Ford Fusion [STEW_00003140]; |
| Government's Exhibit 5: | Photograph of front of Ford Fusion [STEW_00003141]; |
| Government's Exhibit 6: | Photograph of Smith & Wesson SD40, FXE7732 under passenger seat of Ford Fusion [STEW_00003144]; |
| Government's Exhibit 7: | Photograph of Smith & Wesson SD40, FXE7732 [STEW_00003145]; |
| Government's Exhibit 8: | *Miranda* Form [STEW_00003121-3122]; |
| Government's Exhibit 9: | Recorded interview of Defendant [STEW_00003123]; |
| Government's Exhibit 9(a): | Excerpt from 13:32:50-13:34:45 from recorded interview of Defendant [STEW_00003123]; and |
| Government's Exhibit 9(b): | Excerpt from 14:05:34-14:05:51 from recorded interview of Defendant [STEW_00003123]. |

The Court took judicial notice of Defendant's bond report (Doc. 8). (Tr. at 5)

## II. **FINDINGS OF FACT**

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1.  James Rader is a detective with the Lenexa, Kansas Police Department. (Tr. at 6) He is also assigned to the FBI Violent Crimes Fugitive Task Force and the Kansas City, Missouri Criminal Task Force. (Tr. at 6-7)

2.  As a Task Force Officer for the FBI, Detective Rader locates and arrests violent felons with outstanding warrants. (Tr. at 7) In this role, Detective Rader does not investigate the offense(s) underlying the warrant. (Tr. at 7)

3.  By contrast, Detective Rader does perform investigatory work in connection with his role as a detective with the Lenexa, Kansas, Police Department. (Tr. at 7-9) In August of 2021, Detective Rader was investigating an aggravated battery and aggravated burglary that had occurred on July 4, 2021, and that involved three suspects, including Defendant. (Tr. at 8-9, 35, 48) An

2

individual named "Xavier Brantley" was the primary and principal aggressor. (Tr. at 9) One of the suspects[1] told Detective Rader that Defendant had taken a handgun to the incident, and that Defendant always had a gun with him. (Tr. at 40, 42, 57-58) The victims of the incident indicated only Mr. Brantley had a gun. (Tr. at 42)

4. On August 5, 2021, Detective Rader arrested Mr. Brantley at his residence. (Tr. at 9, 36) During the course of Mr. Brantley's arrest, law enforcement searched his home. (Tr. at 9) Officers located an empty holster and a case for a firearm with a loaded .40-caliber magazine inside in the basement living area. (Tr. at 10-11; Gvt. Exhs. 1, 2) Mr. Brantley told law enforcement that Defendant lived in the basement. (Tr. at 11, 36)

5. Mr. Brantley initially stated that the holster, firearm case and magazine belonged to Defendant. (Tr. at 57) When Detective Rader mentioned Defendant was a convicted felon who could not possess them, Mr. Brantley stated everything in the basement was his. (Tr. at 36-37, 57)

6. Later on August 5, 2021, at approximately 4:45 p.m., Detective Rader was working at his desk at the Lenexa Police Department and received a call from Defendant. (Tr. at 11) Defendant was at work when he called. (Gvt. Exh. 3) Detective Rader spoke with Defendant for approximately eight minutes; the entire conversation was recorded. (Tr. at 12; Gvt. Exh. 3)

7. During the call, Detective Rader asked Defendant about the items recovered from Mr. Brantley's house. (Tr. at 12; Gvt. Exh. 3(a)) Defendant stated he had a gun that he took to work at a security job, but that he had sold it. (Tr. at 12, 38-39, 41-42; Gvt. Exh. 3(a)) Defendant further stated he did not have a gun during the July 4, 2021, incident. (Tr. at 41, 42; Gvt. Exh. 3)

---

[1] The underlying case contained differing accounts of the events that precipitated the assault. (Tr. at 60-61) The Court does not make a determination on the veracity of such accounts, but merely acknowledges the differences in the context of information given to Detective Rader.

8. Detective Rader testified that in his twenty-nine and a half years in law enforcement, witnesses and suspects do not always tell the truth. (Tr. at 58)

9. Using Defendant's number from the call, Detective Rader obtained a GPS phone tracker so that law enforcement could attempt to locate and arrest Defendant on the Johnson County, Kansas warrant in the aggravated battery and aggravated burglary case. (Tr. at 8, 12, 13-14)

10. On August 10, 2021, the FBI Fugitive Task Force assisted in locating Defendant on this arrest warrant. (Tr. at 8, 14) The GPS tracker indicated Defendant's phone was in the area of 1321 Main Street in Grandview, Missouri. (Tr. at 42-43, 48) Officers, accordingly, established surveillance in the area. (Tr. at 44)

11. At approximately 1:00 p.m., Supervisory Special Agent Nathan Kim first saw Defendant walk out of a building and into the parking lot, and announced his observation over the radio. (Tr. at 14-15, 44) Law enforcement drove over to the area; six to eight officers in tactical gear exited their vehicles with firearms drawn, told Defendant he was under arrest, and placed him in handcuffs. (Tr. at 16-17, 45-46)

12. Defendant was compliant and taken into custody without incident. (Tr. at 17, 46) He was not tased, struck or punched by officers. (Tr. at 17) Defendant did not resist arrest. (Tr. at 17) Defendant did not appear to be under the influence of alcohol or drugs. (Tr. at 17)

13. Defendant has previous felony convictions. (Tr. at 5; Doc. 8)

14. Defendant's person was searched incident to his arrest. (Tr. at 18) Officers located a key fob and a key chain in Defendant's pocket. (Tr. at 18, 47)

15. Detective Rader did not believe Defendant had a vehicle, since Defendant's driver's

license was suspended. (Tr. at 18, 47-48)

16. Detective Rader hit the alarm on the key fob to locate the vehicle with which it was associated. (Tr. at 18-19) A black Ford Fusion responded. (Tr. at 19; Gvt. Exhs. 4, 5) Detective Rader walked to the vehicle while Task Force Officer Stacey Taylor remained with Defendant. (Tr. at 20-21, 49)

17. The Ford Fusion's license plate was registered to Sherry Warden. (Tr. at 20, 49) Detective Rader was not aware of any connection between Defendant and Ms. Warden and was concerned that the vehicle may have been stolen or that Mr. Warden may have been the victim of a crime. (Tr. at 20, 48)

18. Detective Rader looked inside the vehicle from the exterior; he did not open any of car doors. (Tr. at 50) Detective Rader did not observe any contraband. (Tr. at 50)

19. Detective Rader returned to where Defendant was standing and told Defendant he believed there was a firearm in the vehicle. (Tr. at 21, 22, 51) Detective Rader had not advised Defendant of his *Miranda* rights before doing so. (Tr. at 51)

20. Defendant stated there was an "illegal firearm" in the car. (Tr. at 23, 52)

21. Detective Rader told Defendant he was prohibited from possessing a firearm and that he was going to recover it. (Tr. at 23, 52) Detective Rader indicated that Defendant could either give him consent to search the vehicle or that officers could tow the vehicle and apply for a search warrant. (Tr. at 23, 24, 53, 54)

22. Defendant remained under arrest and handcuffed. (Tr. at 24) Detective Rader did not have his gun drawn, nor did he hit or strike Defendant. (Tr. at 24)

23. At this point, less than eight law enforcement officers remained near Defendant. (Tr.

5

at 21-22)

24. Defendant responded that the car belonged to his friend Crystal[2] and that he did not want officers to tow the car and leave her with the bill. (Tr. at 24, 26) Defendant gave Detective Rader permission to search the vehicle and asked Detective Rader to retrieve his wallet. (Tr. at 24, 25)

25. Detective Rader searched the Ford Fusion and located a .40-caliber handgun under the front passenger seat. (Tr. at 25, 55; Gvt. Exhs. 6, 7)

26. Defendant was transported to the Metro Patrol Station. (Tr. at 27, 56) At approximately 1:33 p.m., Detective Rader advised Defendant of his *Miranda* rights. (Tr. at 29; Gvt. Exhs. 8, 9(a)) Detective Rader specifically read the five rights enumerated in the Miranda Warning and Waiver Form. (Gvt. Exhs. 8, 9(a)) Defendant indicated his understanding by nodding and writing his initials beside each written right. (Gvt. Exh. 9(a))

27. Law enforcement did not threaten Defendant, raise their voices, or make any physical contact with Defendant when advising him of his rights. (Tr. at 32)

28. Defendant signed the written waiver form and agreed to speak to law enforcement. (Tr. at 30; Gvt. Exh. 8)

29. Defendant is a high school graduate and had taken some college classes. (Tr. at 30-31)

30. FBI Special Agent Dan Hajek and Detective Rader interviewed Defendant about the incident that took place on July 4, 2021. (Tr. at 27) There is a video and audio recording of the

---

[2] Unbeknownst to Detective Rader at the time, "Crystal" and "Sherry Warden" are the same individual. (Tr. at 26-27)

interview. (Tr. at 28; Gvt. Exh. 9) The interview lasted approximately 50 minutes. (Tr. at 31; Gvt. Exh. 9)

31. In the interview, Detective Rader also asked Defendant about giving him consent to search the Ford Fusion. (Tr. at 32; Gvt. Exh. 9(b)) Defendant stated he remembered giving officers consent and again explained he did not want to burden Ms. Warden with a tow bill. (Tr. at 33; Gvt. Exh. 9(b))

### III. DISCUSSION

Defendant challenges the August 10, 2021, search of the automobile he had driven to work and statement made to law enforcement thereafter.[3] He argues that use of the key fob to locate the vehicle constituted an illegal search under the Fourth Amendment and that his consent to search the vehicle was involuntary. Defendant also argues that his subsequent *Mirandized* statement should be suppressed as the product of an impermissible "question-first tactic." The Government maintains that use of the key fob does not constitute a search, Defendant provided voluntary consent to search the vehicle or, alternatively, that law enforcement had probable cause to do so, and that Defendant's police station statement did not violate *Miranda*.

### A. FIREARM

Defendant seeks to suppress the firearm that Detective Rader recovered from underneath the front passenger seat of the Ford Fusion. At the outset, Defendant argues that activating the key fob's alarm was a warrantless search. This argument is misplaced. The Eighth Circuit has held that use of a key fob to locate a vehicle is not a search under the Fourth Amendment. *United States*

---

[3]Defendant also sought to suppress his un-*Mirandized* statement to Detective Rader that there was an "illegal firearm" in the vehicle. (Doc. 31, pp. 4-9) However, the Government stated it does not intend to introduce Defendant's statement about the firearm made at the scene of his arrest in its case-in-chief at trial. (Doc. 40, p. 10 n.2)

7

*v. Cowan*, 674 F.3d 947, 955-56 (8th Cir. 2012) (holding that the defendant did not have a reasonable expectation of privacy in the identity of his car).

Even if, *arguendo*, Detective Rader's use of the key fob to locate Defendant's vehicle were found to constitute a search, such search was lawful under the Fourth Amendment's automobile exception. The automobile exception allows officers to search a vehicle without a warrant if there is probable cause to believe that contraband or evidence of criminal activity is located inside. *United States v. Ross*, 456 U.S. 798, 825 (1982); *United States v. Merrett*, 8 F.4th 743, 751 (8th Cir. 2021). "Probable cause exists where, under the totality of the circumstances, there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017); *United States v. Walker*, 840 F.3d 477, 484 (8th Cir. 2016). Officers "may draw upon inferences based upon their experience" in determining the existence of probable cause. *United States v. Cortez-Palomino*, 438 F.3d 910, 913 (8th Cir. 2006). Probable cause does not require officers to rule out all innocent explanations. *United States v. Meyer*, 19 F.4th 1028, 1032 (8th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018)). The probable cause standard "is not a high bar." *Wesby*, 583 U.S. at 57 (quoting *Kaley v. United States*, 571 U.S. 320, 134 S. Ct. 1090 (2014)).

In this case, Detective Rader had been investigating an aggravated battery and aggravated burglary in which Defendant was one of three suspects. (Fact No. 3) As part of this investigation, one of the other suspects told Detective Rader that Defendant had a gun during the incident and that Defendant always had a gun with him. (Fact No. 3) When Detective Rader arrested Mr. Brantley and searched the basement area in his residence where Defendant lived, he found an empty holster

and a firearm case with a loaded magazine inside.  (Fact No. 4)  Mr. Brantley initially stated the items belonged to Defendant.  (Fact No. 5)  Only after Detective Rader mentioned that Defendant's felony status prevented him from lawfully owning such items did Mr. Brantley change his story and claim personal ownership.  (Fact No. 5)  When Defendant called Detective Rader later that same day, Defendant stated he had a gun but that he had sold it.  (Fact No. 7)  Detective Rader testified that it was his experience after twenty-nine and a half years in law enforcement that witnesses and suspects do not always tell the truth.  (Fact No. 8)  The totality of these circumstances -- specifically, the information from a co-suspect that Defendant always had a gun with him; the empty holster, firearm case and loaded magazine found during the August 5, 2021, daytime search of the area of Mr. Brantley's house where Defendant lived; and the daytime arrest of Defendant at his workplace five days later during which a firearm was not found on Defendant's person, all coupled with Detective Rader's professional experience that individuals are not always truthful -- provide a "fair probability" that the Ford Fusion contained "contraband or evidence of a crime." Accordingly, Detective Rader was permitted to perform a warrantless search.  Defendant's motion to suppress should be denied on this basis.

Defendant next contends that although he verbally consented to law enforcement searching the Ford Fusion, such consent was involuntary due to coercion.  "A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion." *United States v. Magallon*, 984 F.3d 1263, 1280 (8th Cir. 2021).  The burden falls on the government to prove by a preponderance of the evidence that consent was voluntary.  *Id.*  Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker," rather than the "product of duress or coercion, express or implied."  *Schneckloth v. Bustamonte*, 412 U.S. 218,

9

225, 227 (1973). The voluntariness of consent is a "question of fact to be determined from the totality of all the circumstances." *Id*. at 227; *see also United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018). When assessing voluntariness, courts consider the following factors related to both the characteristics of the person giving consent and the environment in which consent was given:

> (1) the defendant's age, (2) the defendant's general intelligence and education, (3) whether the defendant was intoxicated, (4) whether the defendant consented after receiving *Miranda* rights, (5) whether the defendant was aware of his rights and protections because of previous arrests, (6) the length of time the subject was detained, (7) whether the officers acted in a threatening manner, (8) whether law enforcement made any promises or misrepresentations, (9) whether the defendant was in custody or under arrest at the time, (10) whether the consent occurred in public, and (11) whether the defendant was silent as the search was conducted.

*Magallon*, 984 F.3d at 1281; *Carr*, 895 F.3d at 1089; *United States v. Chaidez*, 906 F.3d 377, 381 (8th Cir. 1990). These factors "should not be applied mechanically, and no single factor is dispositive or controlling." *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) (citation omitted).

Here, Defendant is a high school graduate who had taken some college classes (Fact No. 29) He did not appear to be under the influence of any substances. (Fact No. 12) Defendant's criminal history, including previous felony convictions, suggests he was aware of his rights and protections. (Fact No. 13) While exact times are not available, the evidence of record shows Defendant had only been detained a short time before he gave consent. (*See* Fact Nos. 11, 24, 26) *See Carr*, 895 F.3d at 1089 (holding consent was valid when length of detention was not inordinate)*; Magallon*, 984 F.3d at 1282 (holding consent was voluntary when given after a one-and-a-half-hour detention, but after only twenty-one minutes of custodial questioning).

Officers did not act in a threatening manner toward Defendant. (Fact No. 22) Their weapons were not drawn at the time. (Fact No. 22) Although Defendant contends officers gave

10

Case 4:22-cr-00122-SRB    Document 50    Filed 08/29/23    Page 10 of 13

him an ultimatum, the record does not support such a contention. Detective Rader told Defendant he would apply for – not necessarily receive – a warrant. (Fact No. 21) *See United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992) ("When a person consents to a search after officers state they will attempt to obtain a warrant if the person does not consent, the consent is not necessarily coerced.") Defendant was under arrest and handcuffed at the time (Fact No. 22); even though he had not been advised of his *Miranda* rights, such omission does not invalidate Defendant's consent. *United States v. Tapia-Rodriguez*, 968 F.3d 891, 895 (8th Cir. 2020). Defendant gave consent in a public parking lot. (*See* Fact No. 11) He never objected to the search and, in fact, asked officers to retrieve his wallet from inside the vehicle. (Fact No. 24) The Court thus finds that the preponderance of evidence shows Defendant's consent was voluntary and recommends denial of his motion to suppress.[4]

### B. *MIRANDIZED* STATEMENT

Defendant maintains that the statement he made to Detective Rader and Special Agent Hajek at the Metro Patrol Station should be suppressed. Citing *Missouri v. Seibert*, 542 U.S. 600 (2004), Defendant argues this statement was obtained in violation of his *Miranda* rights since he had already confessed to possessing the firearm.

In *Seibert*, the Supreme Court held that *Mirandized* statements must be suppressed "only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." 542 U.S. at 622 (Kennedy, J., concurring). *See also United States v. Rooney*, 63 F.4th 1160, 1167 (8th Cir. 2023) ("Our precedent treats Justice Kennedy's

---

[4]The Court notes that, independent of Detective Rader's use of the key fob to identify the Ford Fusion, the same facts also support application of the automobile exception to justify the warrantless search of the interior of vehicle during which the firearm was located.

11

concurrence as controlling because it provided the fifth vote necessary for a majority and was decided on narrower grounds than the plurality opinion."); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007). Examination of the facts surrounding Defendant's un-*Mirandized* statement reveals this technique was not used. Detective Rader's first interrogation of Defendant at the scene of his arrest was brief. The second, Mirandized interrogation took place a short time later at the station. (Fact No. 26) There is simply no evidence law enforcement had any strategy to circumvent the requirements of *Miranda*.

Because law enforcement did not make a calculated attempt to undermine *Miranda*, the Court instead analyzes the voluntariness of Defendant's waiver. *Rooney*, 63 F.4th at 1167; *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013 (8th Cir. 2003). A *Miranda* waiver must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Rooney*, 63 F.4th at 1168. Additionally, the defendant must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (quoting *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011)). Courts consider the totality of the circumstances in determining whether a *Miranda* waiver is valid. *Id*. Relevant factors include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id*. (quoting *Magallon*, 984 F.3d at 1284).

The facts of this case demonstrate Defendant's *Miranda* waiver was voluntary. As discussed more fully, *supra*, Defendant had a high school diploma. (Fact No. 29) He did not appear to be under the influence or otherwise impaired. (Fact No. 12) Defendant had previous interactions with law enforcement. (Fact No. 13) *See Vinton*, 631 F.3d at 482. There was no indication

12

Defendant did not understand his rights or the consequences of waiving them. Law enforcement did not threaten Defendant, raise their voices or make any physical contact with Defendant. (Fact No. 27) After being advised of his rights, Defendant initialed each of the five enumerated rights and signed the written waiver form. (Fact Nos. 26, 28) *See United States v. Gallardo*, 495 F.3d 982, 991 (8th Cir. 2007). Suppression is not warranted on this basis.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

        /s/ *Jill A. Morris*
        JILL A. MORRIS
UNITED STATES MAGISTRATE JUDGE